Gary KNOP, John Ford, William Lovett, II, Ramando Valeroso, Gus Jansson, Pat Sommerville, Vernard Cohen, T. Jon Spytma, Robert Shipp, Butch Davis, Ron Mixon, and Kerwin Cook, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

Perry M. JOHNSON, Robert Brown, Jr., Dale Foltz, John Jabe, Theodore Koehler, John Prelesnik, and Jack Bergman, Defendants.

File No. G84–651.

United States District Court,
W.D. Michigan, S.D.

April 5, 1989.

National Prison Project of the American Civil Liberties Foundation, by Elizabeth Alexander, Adjoa Aiyetoro, Mark Lopez, Jenner & Block, Washington, D.C. by Bruce J. Ennis, Donald Verelli and Theresa Chmara, for plaintiffs.

Frank Kelley, Atty. Gen., Lansing, Mich., by Thomas C. Nelson and Brent Simmons, for defendants.

## OPINION

ENSLEN, District Judge.

This matter is before the Court on plaintiffs' counsel's petition for attorneys fees pursuant to 42 U.S.C. § 1988. After nearly five years of litigation in a major prison conditions case, resulting in a judgment favorable to the plaintiff class, plaintiffs' counsel seek $2,043,960.38 in attorneys fees, expenses and costs. The facts and legal issues involved in this matter are adequately reported in this Court's published decisions, *Knop v. Johnson*, 667 F.Supp. 467 (W.D.Mich.1987); and *Knop v. Johnson*, 685 F.Supp. 636 (W.D.Mich.1988); and will not be repeated here.

Defendants have interposed a number of objections to plaintiffs' fee request. They contend that plaintiffs' counsel are entitled to $156,950.00 in attorneys' fees and $1,067.50 in costs and expenses. This calculation can most charitably be described as a gross underestimation. The trial alone in this matter lasted 35 days. Hearings on the remedial plans submitted by the parties lasted another four days. Plaintiffs were represented by four attorneys at trial and three at the remedial hearing. Assuming a trial or hearing day of 4.5 hours and compensation at an hourly rate even defendants admit is reasonable, $100 per hour, plaintiffs' counsel are enti-

tled to $68,400 in fees for in-court time alone. This does not include their substantial travel time, or the hours they spent attending the many hearings on non-dispositive matters held in this case.

That having been said, however, the Court finds that a number of the defendants' objections have substantial merit. While I have concluded that the reductions advocated by defendants are too extreme, the fee petition must be reduced to account for plaintiffs' partial success on the race claim, excessive or duplicative hours and non-compensable costs and expenses. After conducting a two-day evidentiary hearing and reviewing each entry on each billing and expense record submitted by counsel, I find that attorneys fees in the amount of $1,299,563.04 and costs and expenses in the amount of $184,443.24 are appropriate. This results in a total award of $1,484,-006.28.

Plaintiffs' counsel have submitted three separate applications for fees. This opinion treats each application separately. The Court's calculations of reasonable attorneys' fees for each application and the allowable expenses and costs may be found in the tables annexed to this Opinion.

## I. Amended Petition for Attorneys Fees and Costs

Plaintiffs' counsel initially submitted their petition for attorneys fees on April 12, 1988. After discovering that computer errors had resulted in some duplicative entries on their billing records, plaintiffs' submitted an amended application for fees on November 28, 1988. This Opinion refers to the billing records attached to the amended application.

### A. Reasonable Hours

■ Having won a judgment in their favor, plaintiffs are without doubt "prevailing parties" within the meaning of § 1988. Plaintiffs' counsel are thus entitled to reasonable attorneys' fees, expenses and costs for their efforts. In *Hensley v. Eckerhart,*

461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983), the Supreme Court held that the appropriate method for determining reasonable attorneys fees under § 1988 is to determine the number of hours "reasonably expended on the litigation," and to multiply that figure by a reasonable hourly rate.[1] The ultimate fee award must reflect the degree to which plaintiffs succeeded on their claims for relief and deny compensation for hours that were not reasonably expended on the litigation. *Id.* at 434, 103 S.Ct. at 1939–40.

#### 1. *Partial Success on the Merits*

One of the defendants' major contentions is that the fee award must be reduced to reflect the limited degree of success plaintiffs obtained on the race discrimination claims. Plaintiffs began this litigation with a number of claims regarding racial discrimination against prisoners. These included: (1) discrimination in job assignment; (2) segregation of cafeteria serving lines; (3) discrimination in assignment to punitive segregation and protective custody; and (4) staff displays of racially motivated hostility toward black inmates. First Amended Complaint ¶ 55. Plaintiffs succeeded on only one of those claims—the claim that staff engaged in racially derogatory behavior, principally the use of racial slurs, against black inmates. *Knop v. Johnson,* 667 F.Supp. 467, 504–07 (W.D. Mich.1987). The defendants argue that the majority of time spent on plaintiffs' race claims involved the claims of discrimination in job assignment, punitive segregation and cafeteria serving lines. They argue that the fee request should be substantially reduced to reflect the hours spent on these unsuccessful claims.

In *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940, the Supreme Court held that a party's fee award must be reduced where the party prevailed on some, but not all of the claims presented. "In this situation two questions must be addressed. First, did the plaintiff fail to prevail on claims that

1. The product of reasonable hours and hourly rates is generally referred to as the "lodestar" figure.

were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" *Id.* at 434, 103 S.Ct. at 1940. Claims are unrelated where they are "distinctly different claims for relief that are based on different facts and legal theories." *Id.* In such instances: "The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim." *Id.* at 435, 103 S.Ct. at 1940. *See also Smith v. Robinson,* 468 U.S. 992, 1006, 104 S.Ct. 3457, 3465, 82 L.Ed.2d 746 (1984) (court must evaluate the requested fee "in light of the relationship between particular claims for which work is done and the plaintiff's success").

Where the plaintiff's successful and unsuccessful claims are based on "a common core of facts" and "related legal theories," the lawsuit cannot be viewed as a series of discrete claims, and "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940. In making these determinations, the court "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Id.* at 436–37, 103 S.Ct. at 1941.

A number of cases have allowed compensation for hours spent on unsuccessful claims where the successful and unsuccessful claims involve a common core of facts and rely upon related legal theories. *City of Riverside v. Rivera,* 477 U.S. 561, 571, 106 S.Ct. 2686, 2693, 91 L.Ed.2d 466 (1986); *Abshire v. Walls,* 830 F.2d 1277, 1283 (4th Cir.1987); *Davis v. City of Charleston,* 827 F.2d 317, 323 (8th Cir.1987); *Toussaint v. McCarthy,* 826 F.2d 901, 905 (9th Cir.1987); *Wolfel v. Bates,* 749 F.2d 7, 9 (6th Cir. 1984); *Vaughns v. Board of Education,* 598 F.Supp. 1262, 1271–72 (D.Md.1984). Alternatively, claims may be considered related where they seek relief for essentially the same course of conduct. "Under this analysis, an unsuccessful claim will be *un*-related to a successful claim when the relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised." *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1279 (7th Cir.1983).

■ As the Supreme Court recognized in *Hensley* and *Smith,* it is often difficult to determine which hours expended on a case contributed to the relief obtained and which did not. This is especially true where the plaintiffs raise a number of conceptually distinct but factually related claims. In such circumstances, it is appropriate to reduce the fee applicant's award by a flat amount, rather than attempting to determine which specific hours were spent on the unsuccessful claims. In *Toussaint,* for example, the court concluded that the plaintiffs' various claims were not easily categorized as "related" or "unrelated." Although the claims were based upon related facts and legal theories, the plaintiffs had achieved only limited success on appeal, and it was impossible to determine the exact number of hours spent on each claim. Thus, the court reduced the fee award by one-third, to account for plaintiffs' "very limited" success on appeal. *Toussaint,* 826 F.2d at 905.

■ Plaintiffs achieved only partial success on their race-related claims. They submit that they are entitled to full compensation for hours spent on these claims because the Court found their statistical evidence to be significant, because the results obtained are extremely significant to the plaintiff class, and because the Court's ruling on the racial slur issue will impact corrections officials not only in Michigan, but across the country. Defendants argue that because plaintiffs' billing records make it impossible to determine exactly how much time was spent on the unsuccessful claims, virtually all of the hours claimed must be excluded either as spent on unsuccessful claims or as inadequately documented.

■ I find the defendants' suggestion to be completely unreasonable. Clearly, where the documentation of hours in inadequate, the Court may reduce an award of attorneys fees or deny the petition in its entirety. *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939. Acceptance of defendants' objection would, however, result in an almost complete denial of fees. A denial of fees for inadequate documentation is generally reserved for cases where the petition is unsupported by contemporaneous time records or is otherwise wholly undocumented. *Southerland v. International Longshoremen's Local 8,* 845 F.2d 796, 801 (9th Cir.1988) ("Total denial of fees because of poor documentation is a stringent sanction, to be reserved for only the most severe of situations..."). While it is preferable for counsel to "maintain billing time records in a manner that will enable a reviewing court to identify distinct claims," it is also true that "counsel ... is not required to record in great detail how each minute of his time was expended." *Hensley,* 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12. *See also Toussaint v. McCarthy,* 826 F.2d 901, 905 (9th Cir.1987) (where plaintiffs' claims involve common facts and legal theories, "it would be unfair to require plaintiffs to produce documentation demonstrating the time spent on each individual issue raised..."). Documentation offered in support of an attorneys' fee petition is sufficient where it is contemporaneously compiled and sufficiently detailed to allow the Court to determine with certainty the number of hours reasonably expended on the litigation. *United Slate, Tile and Composition Roofers, etc. v. G & M Roofing and Sheet Metal Co.,* 732 F.2d 495, 502 (6th Cir.1984).

In considering defendants' objections to the petition for attorneys fees, the Court has reviewed every billing entry on every billing record submitted by plaintiffs. In many instances, the entries identify the specific issue the attorney was working on at the time. At other times, the billing entries are more general. For example, billing entries often state, "prepared responses to interrogatories," or "compiled documents," while at other times they state, "drafted race brief," or "prepared interrogatory answers re: race claims." Because the entries are at times specific and at other times general, I think it fair to assume that at least some of the general entries refer to work relevant to the entire case, while the more specific entries reflect instances where attorneys spent substantial amounts of time working on a discrete claim. While the billing entries are not always as detailed as one would prefer, I am satisfied that they were contemporaneously compiled, and that they accurately reflect the number of hours each attorney spent working on this case. I find that plaintiffs' counsel have adequately documented their request for fees, and I will deny defendants' request to eliminate virtually every hour claimed by counsel for lack of proper documentation.

■ The plaintiffs' position, however, is also unreasonable. They simply were not successful in obtaining the relief sought on a large percentage of their race-related claims. Hopefully, the Court's ruling on the racial slur issue will enhance the lives of the plaintiff class and will convince prison officials here and elsewhere to aggressively discipline staff for such conduct. Perhaps at some point in the future, the Court's findings regarding plaintiffs' statistical evidence will be helpful in another race discrimination suit. But the fact remains that plaintiffs were unsuccessful in the attempt to convince the Court that the defendants segregated cafeteria serving lines, or that they discriminated on the basis of race in job assignments or in assignments to administrative segregation or protective custody. Under *Hensley* and its progeny, their fee award must be reduced by some amount to account for this partial success.

The question of how much to reduce the fee award is one of great difficulty for the Court. The various race claims are unrelated in the sense that they each relate to different policies and conduct of the defendants. They are related in the sense that the evidence of discriminatory intent and conduct was relevant to both the successful and unsuccessful race claims. Certainly, if

plaintiffs had chosen from the beginning to pursue only the racial slur issue, their attorney fees and costs would be lower. On the other hand, the costs and fees associated with the race claims would not have been eliminated entirely. Presumably, plaintiffs' counsel would have had to conduct numerous prisoner interviews, review records compiled by the defendants and consult expert witnesses in substantiating that claim.

Nor can it be said with confidence that none of the information compiled on the unsuccessful race discrimination claims contributed to plaintiffs' success on the racial slur claim. For example, much of the testimony about racial slurs was elicited while prisoner witnesses were testifying about other issues, and the evidence regarding racially stereotypic views held by staff contributed to the Court's finding that the Department of Corrections at least implicitly authorized racially motivated conduct by staff. This information, in all likelihood, would not have been discovered or presented to the Court had plaintiffs not chosen to proceed to trial on the unsuccessful race claims. The matter is further complicated by the fact that some attorneys spent a great deal of time on the race issues, while others spent relatively little time on those claims.

Because the billing records do not always identify the particular issue involved, and because some attorneys had more responsibility for the race claims than did others, I find that it would be unfair to reduce all attorneys' fees by some arbitrary percentage to account for the partial success on these claims. By the same token, the sheer bulk of the billing sheets, their failure to always identify the particular issue involved and the relationship between the various race claims, makes it difficult to determine with certainty the exact number of hours spent on the unsuccessful claims. For these reasons, I adopted the following methodology in determining the appropriate reduction of plaintiffs' fee request.

I reviewed each billing entry and attempted to identify those hours spent working on the unsuccessful claims. In the course of this review, I also considered the hours defendants identified as having been spent on unsuccessful claims.[2] I then determined the percentage of each attorneys' time attributable to work on the race claims.[3] Because many of the billing entries are general, rather than specific, this process probably understates the amount of time each attorney spent on the race claims in general. However, since the plaintiffs succeeded on one of their race claims, and since a portion of the hours attributable to the unsuccessful claims are reasonably related to that successful claim, I find that it is equitable to reduce each attorney's claimed hours by this percentage. This method compensates the plaintiffs for hours spent on tasks related to their successful claims, while reducing the overall award to account for their partial success.

### 2. *Excessive or Duplicative Hours*

 Defendants' next major objection is that the attorneys' fees request should be substantially reduced to account for duplication of effort, excessive time spent on routine tasks and inefficient use of attorney time. A moderate reduction in claims hours is appropriate where counsels' billing records indicate substantial duplication of effort or inefficiency. *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939–40 ("Cases may be overstaffed and the skill and experience of lawyers vary widely. Counsel … should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary"); *Ramos v. Lamm,* 713 F.2d 546, 554 (10th Cir.1983). The bulk of the hours claimed are attributed to four attorneys who had primary responsibility for this litigation: Elizabeth Alexander, Adjoa Aiyetoro, Patricia Streeter, and Nkechi Taifa–Caldwell. Four other attorneys, one paralegal and a number of law clerks and law student interns also expended hours attributable to

---

**2.** *See,* Defendants' Objections to Plaintiffs' Application for Attorneys Fees and Costs, Exhibits A–G; Defendants Exhibits 6–17.

**3.** *See* Table 1, *infra.*

this case. Many hours claimed were spent in conferences between attorneys and law clerks. It is within the Court's discretion to grant attorneys fees for time spent conferring with co-counsel and with subordinates, and I will do so here. *Berberena v. Coler*, 753 F.2d 629, 633 (7th Cir.1985); *National Association of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1337 (D.C.Cir.1982); *Daggett v. Kimmelman*, 617 F.Supp. 1269, 1280–81 (D.N.J. 1985); *aff'd in relevant part*, 811 F.2d 793 (3d Cir.1987).

▪ *Hensley* requires that counsel for a prevailing party exercise "billing judgment" in making a fee request, and that counsel excise "excessive, redundant, or otherwise unnecessary" hours from that request. 461 U.S. at 464, 103 S.Ct. at 1955. Plaintiffs' counsel are entitled to compensation for all hours reasonably expended on their successful claims, but they are not entitled to compensation for hours attributable to "overkill" or to the assumption that "the standard of service to be rendered and compensated is one of perfection, the best that illimitable expenditures of time can achieve." *Grendel's Den Inc. v. Larkin*, 749 F.2d 945, 953 (1st Cir.1984). Similarly, because more experienced attorneys charge higher rates for their services, they are expected to perform legal work in an expedited manner. *Garrett v. Goodwin*, 588 F.Supp. 825, 828 (E.D.Ark, 1984). As the Third Circuit noted in *Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir.1983), "A fee applicant cannot demand a high hourly rate—which is based upon his or her experience, reputation, and a presumed familiarity with the applicable law—and then run up an inordinate amount of time researching the same law. Double dipping, in any form, cannot be condoned." On the other hand, it is also necessary to evaluate the defendants' conduct in determining whether claimed hours were reasonably spent. As the Supreme Court noted in *City of Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986), defense counsel "cannot litigate tenaciously and then be heard to complain about the

time necessarily spent by the plaintiff in response." *See also Chrapliwy v. Uniroyal Inc.*, 583 F.Supp. 40, 49 (N.D.Ind.1983) ("It was … [defendants'] right to contest every aspect of this claim, but they cannot now disclaim the consequences of their actions").

▪ The requirement under *Hensley* is that plaintiffs' hours be reasonably spent. There is no requirement that plaintiffs' counsel staff their cases or delegate responsibilities in the same way that defense counsel would. In reviewing plaintiffs' billing records in light of this objection, I found very few instances of the excessive or duplicative work defense counsel claimed existed. While a small reduction is appropriate for certain hours, I will decline defendants' invitation to reduce counsels' hours by twenty (20%) percent. The billing records do not substantiate such a large reduction.

▪ Defendants particularly object to the hours claimed by Taifa–Caldwell as excessive or duplicative, given her general inexperience. Ms. Taifa–Caldwell's inexperience is reflected in the lower hourly rate requested for her services. In analyzing each of the hours defendants objected to because they were "excessive, duplicative or compensable at a lower rate," I discovered that defendants object to virtually every hour she spent responding to prisoner correspondence, summarizing depositions and analyzing them for admissions, scheduling trips and depositions, researching, compiling documents for exhibits and attachments to briefs and proof reading plaintiffs' submissions. I find that these activities are appropriately delegated to an inexperienced attorney and that the hours claimed for these services are compensable. Obviously, plaintiffs' counsel had an ethical duty to communicate with their clients, and time spent on that task is compensable. The time spent proof reading was time well spent, and the Court sincerely wishes counsel for the defense had been as conscientious in that regard during the course of this litigation.[4] In short, after reviewing

---

4. I have often commented on the proofreading

skills exhibited by defense counsel in this mat-

Ms. Taifa–Caldwell's billing records, I do not find a substantial number of "excessive" hours spent on "routine" tasks as easily delegated to support staff. I will therefore decline to reduce her claimed hours on that basis.

In reviewing the hours claimed by Ms. Aiyetoro, I also do not find evidence of excessive duplication or hours spent on routine tasks. Many of the defendants' objections relate to hours Ms. Aiyetoro spent compiling documents and exhibits, and hours she spent coordinating witness appearances. I do not find those hours to be excessive. Although most document identification can be handled by support staff or less experienced attorneys, the attorney with primary responsibility for conducting deposition or trial testimony must also spend some time compiling and reviewing the pertinent documents. Similarly, some one with knowledge of the case and the trial schedule had to assume responsibility for identifying the prisoner witnesses and coordinating their appearances. The hours Ms. Aiyetoro spent on these tasks are not excessive or unreasonable. Defendants object that on May 1, 1986, Ms. Aiyetoro claims to have spent 25.2 hours working on this case. While I note that those billings are either excessive or an error in transcription, *see* Plaintiffs' Reply Memorandum in Support of Petition for Attorneys Fees, Sept. 16, 1988 at 6, n. 5, at least half of the hours claimed have already been excised as related to unsuccessful claims. There is no need to further excise these hours for possible duplication.

█ On a number of other occasions, Ms. Aiyetoro billed more than eight hours for a single day. Standing alone, I do not view this as evidence of duplication or inefficiency. It is certainly not unusual for attorneys to work long hours when they are litigating a complex matter, and in fact

I would be more suspicious of the billing entries if there were not days where counsel claimed to have spent more than eight hours working on this case.[5] *See Ramos v. Lamm,* 632 F.Supp. 376, 381, 383 (D.Colo. 1986). Defendants also object to the 127.6 hours Ms. Aiyetoro spent working on plaintiffs' response to their motion to dismiss in December, 1986. I note first that, during this period, at least six motions to dismiss were pending, each of which was accompanied by an oversized brief. It comes as no surprise that the plaintiffs' research and drafting time in responding to these motions was considerable. I would agree, however, that at least a portion of this time could have been delegated to a less experienced, and less expensive attorney.

In reviewing Ms. Aiyetoro's billing records, I did not find a substantial number of entries indicating duplicative work. As noted above, I find that many of the hours defendants object to on this basis were, in fact, reasonably spent. I did, however, find a number of entries that are objectionable. For example, on June 6 and 7, 1985, Ms. Aiyetoro bills nine hours for travel between Washington, D.C. and Lansing, but appears to have performed no compensable services on or near those dates. On November 21, 1985, she spent 17.5 hours preparing for a two hour deposition. On May 14 and 15, 1986, Ms. Aiyetoro spent 15 hours marking documents. On August 5, 1986, she spent 2.25 hours in court organizing exhibits. These are examples of the hours I identified as having been unreasonably spent, in addition to those spent responding to the motion to dismiss. A two percent reduction in her claimed hours is sufficient to account for the possibility that she spent excessive amounts of time on certain tasks.

---

ter. *See e.g., Knop v. Johnson,* 667 F.Supp. 512, 520 n. 1 (W.D.Mich.1987). Apparently impervious to constructive criticism, the defendants' objections to plaintiffs' petition for fees show typographical errors on virtually every page, and the Court's copy of that document contained only the odd-numbered pages. (Fortunately, by digging through the Clerk of the Court files, I found the even-numbered pages.)

**5.** Perhaps the defendants' attorneys are not used to working such lengthy hours. I do not know how many hours most Assistant Attorneys General work each week, but I do know that working hours in my chambers exceed 50 hours a week as a general rule, and often total between 60 and 80 hours per week during trial terms.

Defendants' primary objection to Ms. Alexander's hours is that she spent long periods of time drafting briefs and other documents, when the research and initial drafting could have been less expensively delegated to a subordinate. Ms. Alexander testified that she did most of the research and briefing in this case by herself because she wanted to brief the complex legal issues presented carefully, and because she did not trust junior attorneys or law clerks to do the work as thoroughly as she would. I have reviewed Ms. Alexander's billing records, and while she clearly spent a great deal of time on briefing tasks, there is nothing excessive or unreasonable about the hours claimed. In all likelihood, these hours would have been greater had the research or initial drafting been delegated to less experienced counsel. Further, I found no evidence of duplicated effort on the brief writing. The other lawyers involved do not bill large amounts of time for work on the same documents. I find that these hours were efficiently and reasonably spent, and I will decline defendants' request that they be reduced.

I did find some evidence of excessive hours in the time Ms. Alexander spent on discovery related matters. In reviewing her time sheets, I noted 263 hours attributed to discovery related tasks such as drafting or answering interrogatories, reviewing documents, summarizing depositions, preparing document lists and marking documents. This number does not include time spent planning discovery, editing or supervising other attorneys' work or discussing information obtained with other counsel. It is certainly necessary for senior attorneys to participate in the discovery process, especially where, as here, the discovery requested by both sides was extensive and the process was complicated by defendants' seeming inability to promptly and properly reply to any discovery request. On the other hand, tasks such as marking documents and summarizing depositions are routinely delegated either to paralegals or junior attorneys. In light of these considerations, I find that a two percent reduction in Ms. Alexander's claimed hours is sufficient to account for hours which could as easily have been delegated to a less experienced attorney.

I found no evidence of duplication of effort or excessive hours in the hours claimed by the remaining attorneys on the case, the paralegals, law student interns or law clerks. I will, therefore, decline to reduce their hours on this basis.

### 3. *Paralegals and Law Clerks*

Defendants object to the hours billed by paralegals, law clerks and law student interns as vague, excessive or related to unsuccessful issues. I have already excised a portion of their claimed hours as related to unsuccessful issues, and I believe that this reduction is sufficient. The hours claimed by these individuals are neither vaguely documented nor excessive. I find them to be reasonable and compensable, with the exception already noted. *See Louisville Black Police Officers Organization v. City of Louisville*, 700 F.2d 268, 273 (6th Cir.1983); *Stewart v. Rhodes*, 656 F.2d 1216, 1216–17 (6th Cir.1981). Further, plaintiffs' counsel established to my satisfaction at the hearing that they do not treat paralegal and law clerk time as part of their overhead. Compensation for this time is, therefore, appropriate. *Chapman v. Pacific Telephone and Telegraph Co.*, 456 F.Supp. 77, 83 (N.D.Cal.1978).

### 4. *Duplicative Award of Fees for Rule 11 Sanctions*

Defendants also object that plaintiffs' counsel should not be compensated on this petition for time spent seeking Rule 11 sanctions and on the appeal of those sanctions. On August 20, 1987, I granted plaintiffs' counsel $6,165.00 in sanctions for defendants' conduct in filing frivolous motions. *See Knop v. Johnson*, 667 F.Supp. 512, 522 (W.D.Mich.1987). Approximately half of this award compensated plaintiffs' counsel for time spent responding to the frivolous motions, while the other half compensated them for time spent on their Rule 11 briefs. *Id.* An additional sanction of $2,500 was imposed against defense counsel personally and is not at issue at this time.

Although they admit that an award of attorneys fees for this time would be duplicative of the Rule 11 sanctions already granted, plaintiffs' counsel argue that they are entitled to reimbursement for these hours. To deny fees on this motion would, they argue, be to take away the effect of the sanction. I agree. Defense counsel acted in bad faith in filing a number of frivolous motions on the very last day for filing dispositive motions. I assessed attorneys fees against them to punish them for this unprofessional, objectively unreasonable behavior. This petition for attorneys fees is not concerned with defendants' behavior, but with plaintiffs' success. In light of plaintiffs' substantial success, the defendants would have been liable for the attorneys fees and expenses attributable to responding to their frivolous motions, even if I had not awarded sanctions. Obviously, if I deny compensation for these hours on this petition, the punitive effect of the sanction disappears. Defendants' objection is without merit.

### B. Hourly Rates

The defendants next object that the hourly rates sought by plaintiffs' counsel are unreasonably high. Plaintiffs' counsel seeks compensation for the relevant attorneys at hourly rates ranging from a high of $190 to a low of $90. Paralegals, law student interns and law clerks are billed at lower rates, ranging from $65 per hour to $25 per hour. Plaintiffs' counsel have distinguished between time spent in court, out of court and in travel. They have submitted affidavits from three attorneys familiar with billing practices in the State of Michigan indicating that the hourly rates sought are reasonable for attorneys engaged in complex litigation in this state. *See* Declarations of Joseph L. Harding, Plaintiffs' Exhibit ("PX") 1, William Marshall Ellmann, PX 2, William H. Goodman, PX 3. I find as a matter of fact that the hourly rates requested for each attorney are reasonable, in light of the attorneys' expertise in this complex and highly specialized area of the law, the high quality of their representation, the nationwide scope of their practice and the hourly rates

charged by attorneys in private practice for services of a similar nature.

In attacking the rates sought by plaintiffs' counsel, defendants focused upon the following passage from *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984):

> The statute and legislative history established that "reasonable fees" under § 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel.[11]

> 11. We recognize, of course, that determining an appropriate "market rate" for the services of a lawyer is inherently difficult. Market prices of commodities and most services are determined by supply and demand. *In this traditional sense there is no such thing as a prevailing market rate for the service of lawyers in a particular community.* The type of services rendered by lawyers, as well as their experience, skill, and reputation, varies extensively—even within a law firm. Accordingly, the hourly rates of lawyers in private practice also varies widely. ... [T]he critical inquiry in determining reasonableness is now generally recognized as the appropriate hourly rate. And the rates charged in private representations may afford relevant comparisons.

> ... To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence ... that the requested rates are *in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, evidence, and reputation.*

*Id.* at 895–96 and n. 11, 104 S.Ct. at 1547 and n. 11 (emphasis added).

Defendants contend, on the basis of this passage, that plaintiffs' counsel are entitled only to the *median* hourly rate charged by attorneys practicing in Michigan. In support of that contention, they

offered the testimony of Dr. Lawrence Stiffman, an individual who has conducted surveys of billing practices in the Michigan bar. *See* Defendants' Exhibit ("DX") 2. Dr. Stiffman testified that, in his opinion, Michigan lawyers with similar experience, practicing in a firm with between two and seven partners, would charge a median rate of between $110 and $85 per hour for their services. *See* DX 3 at p. 6. Dr. Stiffman prefers to concentrate on the median rate, rather than an average hourly rate, because he believes the median provides a "measure of central tendency" which is not affected by extremely high or low rates charged by a few practitioners in the relevant markets. Dr. Stiffman could offer no opinion on the hourly rates requested for in-court and travel time, because his survey of billing practices does not request or receive information regarding such rates. He further testified that the survey received information regarding attorneys' "overall" hourly rates—the rates used as a beginning point for negotiting actual hourly rates with particular clients on particular cases. His survey did not compile information on rates charged by attorneys for services on particularly complex matters or for the services of particularly skilled, specialized attorneys. Finally, Dr. Stiffman offered an opinion on the median hourly rates charged by attorneys litigating complex matters in federal court. However, he made no attempt to discover, nor did he offer an opinion on, the hourly rates a fee paying client in the state of Michigan would pay for the services of these particular attorneys in litigating this particular case.

■ Defendants appear to assume that the Court is without discretion to award fees at a rate higher than the median hourly rate as determined by Dr. Stiffman's survey. There is no support in the law for that proposition. In *Blum*, the Supreme Court specifically acknowledged that there is no such thing as a single "prevailing market rate" for lawyers' services, and that district courts have discretion to establish a reasonable hourly rate based upon a number of factors, including the attorneys' experience and expertise, and the complexi-

ty or novelty of the case at issue. *See Blum*, 465 U.S. at 895, n. 11, 898–99, 104 S.Ct. at 1547, n. 11, 1548–49 (noting that complexity, novelty, and quality of representation should be reflected in hourly rates awarded). *Blum* does not hold that there is only *one* reasonable market rate. In fact the opinion refers to "prevailing rates," in the plural, further emphasizing the existence of a range of reasonable market rates. Finally, *Blum* contains no language limiting fee awards to median, rather than actual or even above average, market rates.

Further, in *Louisville Black Police Officers Organization*, the Sixth Circuit expressly acknowledged that district courts have discretion to award fees based upon an hourly rate the district court determines to be reasonable.

> ... *Northcross [v. Board of Education*, 611 F.2d 624 (6th Cir.1979)] specifically provides that "[f]or those attorneys who have no private practice, the rates customarily charged in the community for similar services can be looked to for guidance." 611 F.2d at 638. However, in keeping with the discretionary nature of fee awards, we did not require the district court to look *only* to such rates. In fact, there is nothing in *Northcross* to prevent a district judge from adjusting a fee upward or downward to reflect the quality of representation.

*Id.* at 276–77 (emphasis in original). The court further noted that while reasonable hourly rates may be determined by looking to the jurisdiction where a case is tried, *id.* at 277 (quoting *Horace v. City of Pontiac*, 624 F.2d 765, 770 (6th Cir.1980)), the district court retains discretion to award fees based upon other considerations:

> Today's holding is not to be interpreted as *requiring* district courts to always base the fees awarded non-private attorneys on the local rates. District courts are free to look to a national market, an area of specialization market or any other market they believe appropriate to fairly compensate particular attorneys in individual cases. ... [W]e reiterate today that the district courts retain their

discretion in such matters constrained only by their duty to achieve the goal enunciated in *Northcross:* "to make an award of fees which is 'adequate to attract competent counsel, but which do not produce windfalls to attorneys.'" 611 F.2d at 633.

*Louisville Black Police Officers,* 700 F.2d at 278 (emphasis in original). *See also NAACP Detroit Branch v. Detroit Police Officers Association,* 620 F.Supp. 1173, 1183 (E.D.Mich.1985) (awarding fees based upon national market rates and specifically declining to award fees based on a median rate determined by 1981 survey of Michigan bar billing rates).

As the above citations indicate, I have no duty to slavishly adhere to the hourly rates Dr. Stiffman believes are reasonable. First, I think it unreasonable to confine these attorneys to a "median" market rate for their services. These attorneys are nationally recognized experts in a complex field of federal practice. They are by no means the "median" member of the bar, and their hourly rates should be adjusted upward to reflect both their specialization and the extremely high quality of the representation they provided to the plaintiff class. Such an adjustment is not simply reasonable, it is mandated by equity and fairness.

Second, I note that Dr. Stiffman based his opinion of reasonable rates on the assumption that plaintiffs' counsel practice in a firm with between two and seven partners. He further testified that the size of the firm is crucial to determining the hourly rate appropriately charged by counsel. But it is unfair and unreasonable to consider these attorneys as persons who practice for such a small firm. The National Prison Project is but one legal project funded by the American Civil Liberties Union Foundation ("ACLUF"). The Court may take judicial notice of the fact that the ACLUF employs more than seven lawyers, not including the thousands of attorneys across the country who volunteer their time and services to aid the organization's litigating efforts. In light of these considerations, it is more appropriate to consider the National Prison Project a department, or branch office of a large law firm, rather than a separate law firm.

Further, to compensate these attorneys at the lower rates available to lawyers in smaller firms would fail to recognize the truly nationwide scope of the National Prison Project's practice. At present, the National Prison Project is involved in litigation in 22 states. Lawyers from small firms rarely practice outside their particular community, while lawyers from larger firms often have a statewide or nationwide practice, and are entitled to charge higher rates for these services. I note that none of the rates sought by the fee petitioners exceeds the range of rates reported by Dr. Stiffman's study for firms with between 51 and 100 lawyers. *See* DX 2 at p. 23.

Third, Dr. Stiffman could not offer an opinion on what any particular lawyer in Michigan would actually charge a fee paying client to handle a case of this size and complexity. The plaintiffs on the other hand, offered the affidavits of three practicing attorneys in Michigan indicating that the rates sought are equal to or below the rates attorneys in private practice would charge for similar services. In addition, the plaintiffs offered evidence indicating that the defendants themselves consulted outside counsel in this case, and compensated those attorneys at higher hourly rates than those sought here. PX 32. Defendants protest that these rates are not an "admission" on their part of what reasonable hourly rates would be, but the rates do indicate that there are attorneys in Michigan whose hourly rates are similar to those requested here.

Finally, I note that awarding the hourly rates requested would serve the policy announced in *Northcross,* that attorney fee awards should be "adequate to attract competent counsel," without producing a windfall for the attorneys involved. 611 F.2d at 633. *See also Coulter v. State of Tennessee,* 805 F.2d 146, 148 (6th Cir.1986). It has been my experience that prisoners are generally unable to retain attorneys in private

practice.[6] Ms. Alexander testified that, when this litigation was initially contemplated, the National Prison Project contacted the ACLUF's Michigan director to determine whether local counsel could handle the case. Their efforts to find local counsel willing to take on this large a commitment were unsuccessful. An award of fees at relatively high hourly rates is necessary to convince lawyers in private practice to enter this field of litigation.

I find, therefore, that the hourly rates sought by plaintiffs' counsel are reasonable for attorneys practicing in the state of Michigan. To the extent that they are higher than the median rate, the increase is more than justified by the expertise of the attorneys involved, the nationwide scope of their practice, the high quality of the representation they provided their clients, and the complexity of the issues involved in this litigation. An award of fees at the requested rates is also necessary to attract competent counsel to this demanding field of practice. I will, therefore, award plaintiffs' counsel fees at the requested hourly rates. I will apply current, rather than historic hourly rates to compensate plaintiffs' counsel for the delay in payment. *See Louisville Black Police Officers*, 700 F.2d at 276; *Cantor v. Detroit Edison Co.*, 86 F.R.D. 752, 767 (E.D.Mich.1980); *Mader v. Crowell*, 506 F.Supp. 484, 487 (M.D. Tenn.1981).

## C. Multiplier

▮ Plaintiffs' counsel in this case seek a multiplier or enhancement of the lodestar figure for two reasons. First, they argue that defense counsels' uncooperative and unprofessional behavior made litigating this case "hazardous duty," and they should be compensated for having to withstand that behavior. Second, counsel argues that the economic risk associated with this case—the chance that the massive costs advanced in order to litigate the case would not be repaid—justifies a multiplier. Defendants argue that plaintiffs have not achieved the exceptional success necessary to justify a multiplier, that a multiplier

should not be applied to punish counsel for improper behavior and that enhancements based upon the risk on non-recovery are unavailable under *Pennsylvania v. Delaware Valley Citizens' Council*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987).

*Delaware Valley* is, to say the least, a confusing case. A plurality of the Court concluded that fee shifting statutes such as § 1988 should not be construed to permit supplementing the lodestar to compensate counsel for assuming the risk of nonpayment of fees. The plurality went on to reason, however, that even if such enhancements are available, an enhancement was inappropriate in that case. The plurality questioned enhancements based upon the risk of nonpayment for two reasons. First, such enhancements compensate plaintiffs' counsel for having lost other cases, while Congress intended to compensate counsel only when they prevail. Second, such enhancements tend to penalize the defendants who have the most meritorious cases, rather than those whose cases are weak. *Id.* at 725, 107 S.Ct. at 3086, 97 L.Ed.2d at 597. The plurality also concluded, however, that if a risk-based enhancement is appropriate, it "should be reserved for exceptional cases where the need and justification for such enhancement are readily apparent and are supported by evidence in the record and specific findings by the courts." *Id.* at 728, 107 S.Ct. at 3088, 97 L.Ed.2d at 599. Thus, in order to levy a risk-based enhancement, the trial court should find "that without risk enhancement plaintiff would have faced substantial difficulties in finding counsel in the local or other relevant market." *Id.* at 731, 107 S.Ct. at 3089, 97 L.Ed.2d at 601.

Justice O'Connor's concurring opinion held that "Congress did not intend to foreclose consideration of contingency in setting a reasonable fee under fee-shifting provisions...." *Id.* at 731, 107 S.Ct. at 3089, 97 L.Ed.2d at 601. She found that "compensation for contingency must be based on the difference in market treatment of contingent fee cases *as a class* rather than on an assessment of the 'riski-

---

**6.** In this regard, Ms. Streeter is a welcome exception to the rule.

ness' of any particular case." *Id.* Justice O'Connor agreed with the plurality's opinion that risk-based enhancements should be available only where plaintiffs can show an inability to retain competent counsel without the enhancement and with its conclusion that an enhancement was unnecessary in that case. *Id.* at 733, 107 S.Ct. at 3090, 97 L.Ed.2d at 603.

*Delaware Valley* may be read to limit the availability of fee enhancements or multipliers even beyond the limitations imposed by *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). In *Blum,* the Court found that the lodestar figure, the product of reasonable hours and a reasonable hourly rate, "is presumed to be the reasonable fee contemplated by § 1988." *Id.* at 897, 104 S.Ct. at 1548. Enhancement of the lodestar is available in cases of exceptional success or where the "basic standard of reasonable rates multiplied by reasonably expended hours results in a fee that is ... unreasonably low...." *Id.* The Court further found that a number of factors used to justify enhancements, such as the novelty and complexity of the issues involved, the quality of representation or the results obtained, were inappropriate reasons for increasing an otherwise reasonable fee. *Id.* at 898–900, 104 S.Ct. at 1548–1550.

The Supreme Court's decisions in *Delaware Valley* and *Blum* leave at least one avenue available for enhancing the attorneys' fees available under § 1988. Justice O'Connor and the *Delaware Valley* plurality agreed that an enhancement would be available where "necessary to attract competent counsel in the relevant community." 483 U.S. at 734, 107 S.Ct. at 3091, 97 L.Ed. 2d at 603. In this case, an enhancement of the lodestar figure is necessary for that reason. As I noted above, plaintiffs' counsel attempted unsuccessfully to find local counsel willing to litigate this major prison conditions case. This occurred even though the local practitioners were aware of the potential for recovering attorneys fees. Given the complexity of the issues involved, the potential for protracted litigation and the massive expenses which counsel would have to advance in order to prop-

erly litigate this case, it is not surprising that the ACLUF was unsuccessful in its effort to find private attorneys willing to handle more than one aspect of the case. That the lodestar figure also reflects the complexity and length of this particular case does not detract from the need for an enhancement based upon the need to attract competent local counsel to this type of litigation.

In order to convince counsel in private practice to accept cases of this nature, the fee awards must compensate counsel for time spent on the particular case involved, and be sufficient to convince them to forego fees they would have earned from their regular clients in order to properly litigate a case of this nature. Because counsel in private practice are unwilling to accept the responsibility of litigating a major prison conditions case such as this, even with the potential for fee shifting, an enhancement is necessary to vindicate the congressional policy behind section 1988—that of providing competent legal representation for those who are otherwise unable to afford it. *See Delaware Valley,* 483 U.S. at 731, 107 S.Ct. at 3089, 91 L.Ed.2d at 601; *Northcross,* 611 F.2d at 633.

As I read *Delaware Valley,* even the plurality's opinion would not foreclose an enhancement in a case like this where plaintiffs were able to show that local attorneys were unwilling to participate in the case, at least in part because of the enormous cost associated with that participation. Plaintiffs' counsel advanced almost $300,000 in costs and expenses to litigate this case to its conclusion. Indigent civil rights plaintiffs who cannot afford to compensate their attorneys for expenses advanced will never be able to retain counsel in a major civil rights case if counsel are not compensated for the risk that they will not recover these out-of-pocket expenditures. This is true whether the counsel retained comes from the private bar or from a legal assistance project. Charitable organizations, like lawyers in private practice, have limits on the funds they can expend on any particular case. I note further that enhancing fees to com-

pensate for the risk of not recovering these costs does not punish defendants who have strong cases. Rather, it compensates plaintiffs' counsel for accepting cases that are expensive to prove.

■ Other factors mandate that plaintiffs' counsel be awarded an enhancement of the lodestar figure. First, and most significantly, an enhancement is necessary to compensate plaintiffs' counsel for the unpleasantness, stress, and gross inconvenience of litigating against counsel who repeatedly ignored deadlines imposed by the Federal Rules and by the Court, required plaintiffs' counsel to return to Court again and again in order to accomplish adequate discovery, and who launched improper attacks on both plaintiffs' counsel and witnesses. A brief sampling of some instances of defense counsel's unprofessional conduct may be necessary (although undesirable).

First, as plaintiffs' counsel testified at the fee hearing, defense counsel never responded timely to a single discovery request made during this litigation. Although they were repeatedly granted extensions of time, the defendants consistently failed to meet even these extended deadlines. Defendants delayed over five months in responding to plaintiffs' request for admissions. Their answers to interrogatories were as much as four months late. Defendants' responses to requests for production were not simply late, they were virtually non-existent. On at least one instance, plaintiffs were required to travel to Michigan to compile certain documents themselves because defense counsel were simply unwilling to do the work. As a direct result of defense counsels' lack of cooperation, plaintiffs were unable to complete discovery before trial began.

Defendants' uncooperative attitude resulted in the untimely filing of the joint pretrial order. They failed to disclose their list of expert witnesses until November, 1985, nearly five months past the stipulated date for disclosure. Even at this tardy date, defendants' list was incomplete and they subsequently substituted at least one expert witness. Defendants attempted to prevent plaintiffs' expert on race issues from touring the subject institutions, necessitating yet another pretrial hearing. Finally, defendants consistently failed to produce required summaries of their lay witnesses' testimony, and subsequently had some of their lay witnesses stricken.

Plaintiffs are manifestly correct when they argue that defendants' misconduct during discovery was due to counsels' bad faith, rather than the difficulty of responding to the discovery requested. While defense counsel was unable to respond to discovery requests, they were vigorously engaged in filing a massive number of pretrial motions. Some of these motions were meritorious, or at least colorable, while others were patently frivolous.

The unnecessary stress and frustration visited upon plaintiffs' counsel by the defense was not limited to discovery matters. Defense counsel were uncooperative in accomplishing notice to the plaintiff class and arguably violated the Canons of Ethics by communicating directly with members of the class who had been designated as witnesses rather than going through counsel. Interrogatories were served directly upon these individuals, rather than upon their counsel, and included instructions to return the answers directly to defendants. Plaintiffs' counsel were not served with these interrogatories and had to obtain a protective order, necessitating yet another pretrial hearing, in order to prevent this practice. Order of February 19, 1986.

Finally, I note once again, that certain defense counsels' treatment of plaintiffs' counsel and their witnesses fell well below minimal standards of professional courtesy. Their conduct went beyond zealous advocacy and fell directly into the category (or gutter) of personal insult. Certain defense counsel routinely referred to plaintiffs' arguments as laughable, ludicrous, abusive, and speculative. *See,* Response to Order to Show Cause Why Rule 11 Sanctions Should Not Enter, July 18, 1986 at 19 (plaintiffs' case "a reckless and dangerous presentation of obvious untruths, irrelevancies, and misleading information coupled with naive opinions of marginally qualified corps of

self-proclaimed experts"); Reply to Plaintiffs' December 15, 1986 Response, December 23, 1986 at 4, 13, 14, 20, 28, 29 and 34. On at least two occasions, defense counsel accused plaintiffs' counsel of clearly unethical behavior with absolutely no factual foundation for those accusations. *See* Transcript of Hearing, February 19, 1986 (accusing plaintiffs' counsel of forging a document); Brief in Support of Answer ... and Request for Sanction under Rule 11, February 5, 1986 at 7–9 (implying that plaintiffs' counsel fabricated and/or intentionally misrepresented factual basis for motion and requesting that Ms. Alexander be removed as plaintiffs' counsel). Finally, defense counsel treated plaintiffs' witnesses, expert and lay, with extreme disrespect by consistently inquiring into witnesses' religious beliefs, and intimating that these beliefs included racism. *See* Trial Transcript at 2175 ("... does your religion consider whites to be sons of devils?" Objection sustained. "Do they consider whites to be spawns of Satan?"); Reply to Plaintiffs' December 15, 1986 Response to Defendants' Motion for Involuntary Dismissal, December 23, 1986 at 28. Defense counsels' treatment of witness Chapman was especially insulting to everyone involved with this case, including the Court. *See* Defendants' Brief in Support of Involuntary Dismissal, November 26, 1986 at 40–41 (referring to Mr. Chapman's testimony as "nothing more than a worthless, unsupported, rank form of conjecture"); Chapman Dep. at 140–41 (inquiring into whether Mr. Chapman had "ever practiced any form of Islamic faith" as relevant to "a possible source of bias").

██ This type of conduct may (or may not) fall below the level of sanctionable conduct under Rule 11, and in fact I am not concerned with whether the conduct should, in retrospect, have been punished with more force. The point here is that reasonable attorneys should never have to put up with this kind of behavior from their adversaries. The stress, frustration and outrage of having to do so vastly increased the personal toll plaintiffs' counsel paid for participating in this case. That price is not adequately reflected in the lodestar figure,

since personal insults, untimely responses, and uncooperative attitudes do not increase the number of hours one spends litigating a case nor do they increase one's expertise or hourly rate in any meaningful fashion. I wish to emphasize that I find this behavior to be a basis for increasing the lodestar, not because I wish to sanction defense counsel or defendants' themselves, but because I believe that the lodestar does not adequately compensate plaintiffs' counsel for their efforts in this case, efforts which were insulted and frustrated at every turn by the behavior described above. An enhancement or multiplier is available in exceptional cases where the lodestar figure does not result in a reasonable attorneys' fee. *See Pennsylvania v. Delaware Valley Citizens' Council*, 483 U.S. 711, 727, 107 S.Ct. 3078, 3087, 97 L.Ed.2d 585, 599 (1987); *Blum v. Stenson*, 465 U.S. 886, 898, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984); *Kelley v. Metropolitan County Board of Education*, 773 F.2d 677 (6th Cir.1985); *Northcross*, 611 F.2d at 638. The behavior outlined here in brief establishes that this is such an exceptional case, and establishes, in my considered judgment, that the lodestar fee is not adequate to reasonably compensate plaintiffs' counsel for their efforts.

A second source of inconvenience to plaintiffs' counsel also merits an enhancement of the fee award. This case involved four major prisons, widely spaced throughout the state of Michigan, and with the exception of the State Prison of Southern Michigan, located in remote areas. Plaintiffs' counsel were required on several occasions to visit each of these prisons. In addition to the arduous travel, plaintiffs' were inconvenienced by the prison officials' refusal to promptly comply with their requests to interview members of the plaintiff class. Counsel testified at the hearing, and the billing records corroborate, that they were forced to spend long periods of time on each visit simply waiting to see their clients. This is evidence, not only of the defendants' uncooperative behavior, but also of the additional stress and inconvenience plaintiffs' counsel experienced

while litigating this case. The lodestar figure and costs will reimburse counsel for the time and expense of travel, but not for these more intangible difficulties. An enhancement is appropriate for this reason as well.

██ Finally, I note that these reasons for granting a fee enhancement do not necessarily rely upon the degree of success achieved by plaintiffs' counsel. To the extent that a finding of exceptional success is necessary to justify an enhancement, I make it now. Plaintiffs' counsel completely prevailed on four of the five major issues severed for trial. With regard to the fifth issue, racial discrimination, they were partially successful. The results obtained by plaintiffs' counsel are extremely important and beneficial to their clients, because the issues tried affect the plaintiff class members' every day lives. For example, members of the plaintiff class now have adequate winter clothing. They can be assured that their privileged legal mail will be treated as confidential. Prisoners housed in locked cells will no longer have to depend upon a corrections officer's consent to use sanitary toilet facilities. For the first time in Michigan, illiterate or non-English speaking prisoners will be able to consult with legal counsel on their civil rights claims. For other prisoners, their access to the courts has been increased by the expansion of the prisons' law libraries. Finally, and for this Court most significantly, prisoners can be assured that openly racist behavior by corrections officers will no longer go unpunished by the defendants and that their complaints about such behavior will be taken seriously. This recognition of prisoners' basic right to be treated with dignity can only be described as an exceptional success for the plaintiff class.

I find, therefore, that a multiplier, or enhancement of the basic fee is appropriate in this case for four reasons. First, plaintiffs' counsel established to my satisfaction that the costs associated with this litigation, coupled with the risk of non-recovery, made it impossible for the plaintiff class to retain local counsel. Without an enhancement of the basic fee, other similarly situated plaintiffs will also be unable to attract competent local counsel. Second, I find that the increased stress and frustration counsel suffered due to the conduct of defense counsel justifies an enhancement. The basic fee award is insufficient to compensate counsel for the personal costs they paid as a result of their participation in this litigation. Third, a multiplier is justified because of the inherent difficulty of litigating this case, given counsels' limited access to their clients and the difficulties associated with the simultaneously litigating conditions in four separate, remote institutions. Fourth, plaintiffs' counsel achieved exceptional success for their clients. In recognition of these factors, therefore, I have determined that a multiplier of 30% (1.3) should be applied to the basic fee award.

## D. Costs and Expenses

██ Plaintiffs request reimbursement for expert witness fees in the amount of $97,530.61. Defendants object that, under the Supreme Court's recent decision in *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1988), plaintiffs are entitled only to the statutory witness fees provided by 28 U.S. C. § 1821(b). Plaintiffs respond that the use of experts was essential to their success on the merits of this action and that expenses for these witnesses should be allowed as part of the reasonable attorneys fee.

Section 1988 has been construed, as a general rule, to allow reimbursement for all reasonable out-of-pocket expenses incurred by prevailing counsel which normally are charged separately to fee-paying clients and which are not incorporated as part of office overhead into the attorneys' billing rates. *See Kuzma v. I.R.S.*, 821 F.2d 930, 933–34 (2d Cir.1987) (§ 1988 fees include recovery of photocopying, travel and telephone costs, as distinct from "nonrecoverable routine office overhead"); *Mennor v. Fort Hood National Bank*, 829 F.2d 553, 556–57 (5th Cir.1987) (allowing recovery for postage, long-distance telephone calls and travel in Title VII case); *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 30 (D.C.Cir.1984); *Henry v. Weber-*

*meier,* 738 F.2d 188, 192 (7th Cir.1984); *Ramos v. Lamm,* 713 F.2d 546, 559 (10th Cir.1983). The question of expert witness fees has always divided the courts of appeals, however, with some courts holding that these expenses are recoverable as part of the attorneys' fees, *see Heiar v. Crawford County,* 746 F.2d 1190, 1203–04 (7th Cir.1984); and others holding that § 1988 does not authorize compensation for "nonlegal experts." *Davis v. Richmond, Fredericksburg and Potomac R.R.,* 803 F.2d 1322, 1328 (4th Cir.1986).

In *Northcross,* the Sixth Circuit ruled that, "The authority granted in section 1988 to award a 'reasonable attorney's fee' included the authority to award those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services. Reasonable photocopying, paralegal expense, and travel and telephone costs are thus recoverable pursuant to the statutory authority of § 1988." 611 F.2d at 639. In contrast, "docket fees, investigation expenses, deposition expenses, witness expenses and the costs of charts and maps" are recoverable, "in the court's discretion as costs, pursuant to 28 U.S.C. § 1920." *Id.* at 639, 642.

In *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed. 2d 385 (1988), the Supreme Court held that, "absent explicit statutory or contractual authorization for the taxation of the expenses of a litigant's witness as costs, federal courts are bound by the limitations set out in 28 U.S.C. § 1821 and § 1920." Although the *Crawford* Court expressly reserved the question of whether expert witness fees could be reimbursed under § 1988, a number of lower courts have held that *Crawford* prohibits reimbursement of expert witness fees in excess of the statutory limit. *See Sevigny v. Dicksey,* 846 F.2d 953, 959 (4th Cir.1988); *Glenn v. General Motors Corp.,* 841 F.2d 1567, 1575 (11th Cir.1988) ("The broad language in *Crawford Fitting* indicates that, although a statute may shift *attorney* fees, the statute does not operate to shift *witness* fees unless the statute refers explicitly to witness fees"); *Boring v. Kozakiewicz,* 833 F.2d 468, 474 (3d Cir.1987) ("A prevailing party in a civil rights case is not entitled to tax [expert witness] fees as costs"); *Leroy v. City of Houston,* 831 F.2d 576, 584 (5th Cir.1987). At least two district courts have held that *Crawford Fitting* does not preclude recovery of expert witness fees under § 1988. *Hillburn v. Commissioner,* 683 F.Supp. 23, 27 (D.Conn.1987); *United States v. Yonkers Board of Education,* 118 F.R.D. 326, 330 (S.D.N.Y.1987).

It seems to me that the distinction drawn by these courts between reasonable expenses which are recoverable as part of an attorneys' fee, and the cost of expert witnesses which are recoverable only under § 1920, is illogical. Expert witnesses, as surely as long distance telephone calls, photocopies and airline tickets, are necessary expenses in many civil rights cases. Certainly that is true of prison conditions cases. Moreover, the cost of retaining an expert witness is an expense which would normally be billed to a fee-paying client in other types of litigation. Further, I think Congress' intent to allow recovery of necessary expert witness expenses is demonstrated not only by the legislative history of § 1988, 122 Cong.Rec. 35,123 (1976) ("the phrase 'attorney's fees' would include ... all incidental and necessary expenses incurred in furnishing effective and competent representation"); but also by the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(2)(A)(ii), which allows compensation for expert witness fees in actions against the federal government.

Whatever the merits of the rule, however, *Northcross* clearly held that the cost of expert witnesses is compensable, if at all, under § 1920, and *Crawford Fitting* held that § 1920 limits compensation to the statutory witness fee provided by § 1821. Although I wholeheartedly agree with plaintiffs' argument that the use of expert witnesses was crucial to their success on the merits of this action, *Northcross* and *Crawford Fitting* require me, albeit reluctantly, to accept the defendants' position. Costs for expert witnesses are limited to their travel expenses and witness fees of

$30 per day for each day they appeared at a deposition or in court.[7]

Section 1821 provides that witnesses who are before the Court "or before any person authorized to take his deposition" shall be paid an attendance fee of $30 per day for each day's attendance. 28 U.S.C. § 1821(a)(1), (b). Witnesses who travel by common carrier are to be compensated for their travel expenses, 28 U.S.C. § 1821(c)(1), and witnesses who use ground transportation are to be reimbursed for mileage, toll charges, taxicab fares, and parking. 28 U.S.C. § 1821(c)(2)–(3). Witnesses who must stay away from home overnight are also entitled to a subsistence allowance which shall not exceed the maximum per diem allowance for federal employees.

I have reviewed every item of expense claimed by the plaintiffs' counsel, as well as the bills submitted by the expert witnesses themselves. During this review, I checked deposition and testimony dates against counsel's billing records, the Court's docket sheet, and its minute entries from trial and hearing dates. I also considered the objections interposed by defendants as well as their calculation of allowable witness expenses. This calculation was in error because it did not include reimbursement for deposition testimony which is clearly allowed by statute. I find that plaintiffs' counsel are entitled to reimbursement for witness fees and expenses in the amount of $3,691.97.[8]

■ Other out-of-pocket expenses normally reimbursed as part of the attorneys' fees will, however, be allowed. *Crawford Fitting* did not reach this issue, and *Northcross* allows compensation for photocopying, travel, telephone and other extraordinary expenses as part of the reasonable attorneys fee, rather than as costs under § 1920. Other courts have routinely allowed recovery for non-overhead expenses such as postage, and I will do so as well. Because I find that these costs were neces-

sary to the litigation as a whole, I will not reduce them to account for the plaintiffs' partial success. The recoverable expenses would not have differed dramatically had plaintiffs pursued only their successful claims.

In evaluating plaintiffs' claimed expenses for items other than expert witnesses, I checked the expense records against counsels' billing records and against the specific objections interposed by the defendants. I have denied reimbursement where I was unable to find that counsel performed any legal services during the relevant period of time, although I allowed for some margin of error in the recording process (for example, if air fare was recorded for June 3, 1986 but services were performed only on June 2, 1986, I allowed the airfare on the theory that one entry or the other must be a simple mistake.)[9] I have not excluded expenses incurred by counsel in touring the various institutions because I find that these tours were reasonably necessary to the claims upon which plaintiffs prevailed at trial. The same is true for expenses incurred by counsel while attending depositions, hearings or trial. These expenses are charged as part of the reasonable attorneys' fees available under § 1988. Defendants have objected to certain expense entries because more than one attorney attended the trial or hearing involved. I have not excised these expenses because I find that it was reasonable for more than one attorney to attend.

After reviewing every single expense entry, I find that the expenses, with the exceptions noted above, are entirely reasonable and will be awarded. Costs for photocopying, postage, express mail are reasonable. Similarly, I find that the plaintiffs request expenses only for extraordinary secretarial and paralegal expenses. These are expenses which would normally be billed to a client and they will be reimbursed. The same finding pertains to ex-

---

7. This ruling obviates the need to determine whether any reduction in plaintiffs' expert witness expenses is required to account for plaintiffs' partial success on their race claims.

8. *See* Table 1, *infra.*

9. The excluded expenses are itemized in Table 1, *infra.*

penses for air fares, hotel charges, ground transportation and rental cars. Although defendants claim that certain air fares and hotel charges are excessive, I am not prepared to take issue with what airlines and hotels charge for reservations made on short notice or under other exceptional circumstances. I believe that plaintiffs have been entirely honest in their reporting of expenses, and I will reimburse them for the charges claimed.

Defendants successfully pointed out a couple of minor duplicative or erroneous billings. *See* DX 27, 28. I have excised those charges. With regard to the remaining charges, they will be reimbursed as described above.

■ Defendants object that plaintiffs are not entitled to recover costs associated with depositions, such as court reporter fees and transcript costs, unless the deposition was entered into evidence at trial. I disagree. Section 1920 and F.R.Civ.P. 54(d) grant the Court discretion to tax costs for depositions which are reasonably necessary. *Furr v. AT & T Technologies*, 824 F.2d 1537 (10th Cir.1987); *Nissho–Iwai Co. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530 (5th Cir.1984); *In re Air Crash Disaster*, 687 F.2d 626 (2d Cir.1982); *Allen v. U.S. Steel Corp.*, 665 F.2d 689 (5th Cir. 1982); *SCA Services Inc. v. Lucky Stores*, 599 F.2d 178 (7th Cir.1979); *Koppinger v. Cullen–Schlitz & Assoc.*, 513 F.2d 901 (8th Cir.1975); C. Wright, A. Miller & M. Kane, 10 *Federal Practice and Procedure* § 2676 (2d ed.1988) (citing cases). I find that the depositions taken in this case were reasonably necessary to plaintiffs' success on the merits and that costs for those depositions are appropriately taxed against defendants.

Similarly, awarding of costs for trial transcript expenses is within the discretion of the court. *Farmer v. Arabian American Oil Co.*, 379 U.S. 227, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964); *McDowell v. Safeway Stores, Inc.*, 758 F.2d 1293 (8th Cir.1985); *Kenyon v. Automatic Instrument Co.*, 10 F.R.D. 248 (W.D.Mich.1950) *aff'd* 186 F.2d 752 (6th Cir.1951); 28 U.S.C. § 1920(2). Such costs are generally awarded where the transcript was necessarily obtained for use in the case. *See e.g., Wahl v. Carrier Mfg. Co.*, 511 F.2d 209 (7th Cir.1975). Where a trial is long and involves complex issues or where the Court requires proposed findings of fact from the parties, transcript costs are generally allowed. *See Farmer*, 379 U.S. at 233, 85 S.Ct. at 415; *National Bancard Corp. v. VISA, U.S.A.. Inc.*, 112 F.R.D. 62, 64 (S.D.Fla.1986); *Hill v. BASF Wyandotte Corp.*, 547 F.Supp. 348, 352 (E.D.Mich.1982).

In this case, I find that it is appropriate to tax costs associated with obtaining a trial transcript. The trial in this case was lengthy and fragmented. The issues involved were complex and the Court required the parties to submit proposed findings of fact. I find that the costs requested are reasonable and I will tax those costs to the defendants.

## II. First Supplemental Application

In reviewing plaintiffs' first supplemental application for attorneys' fees and expenses, I followed the same methodology described above. With regard to the expenses claimed, I have excised expenses for expert witness fees. I have also excised expenses claimed by Ms. Aiyetoro for the period of time between August 19, 1988 and August 29, 1988. I could find no services performed by Ms. Aiyetoro in *Knop* on those dates, and the dates coincide with a compliance hearing on medical and mental health care issues in *United States v. Michigan*. I find that these services are unrelated to the claims upon which plaintiffs prevailed and that the expenses claimed are not compensable.

I reviewed the attorneys' billing records and found relatively few hours which merited excision. I have deducted two hours from Ms. Alexander's claim for time spent on April 7, 1988 preparing for overcrowding depositions. I believe those depositions were unrelated to the successful claims. Ms. Aiyetoro's hours and Mr. Lopez's hours will be fully compensated. I have also deducted 1.4 hours from the time claimed by law student interns on June 10, 1988. These hours were spent responding to an inquiry about urine testing, a subject

which I believe to be unrelated to the prevailing claims.

With these exceptions, the first supplemental application will be granted at the hourly rates requested by plaintiffs' counsel.[10] For the reasons outlined in my opinion on the amended application, a multiplier of 1.3 will be applied to hours spent working on the merits of this case. No multiplier will be applied to hours spent working on the fee petition itself.

### III. Second Supplemental Application

■ In their second supplemental application, plaintiffs' counsel seek attorneys fees for time expended on the fee litigation itself. Counsel are entitled to reasonable attorneys fees for litigation associated with the fee petition. *Northcross*, 611 F.2d at 631. *Weisenberger v. Huecker*, 593 F.2d 49, 53–54 (6th Cir.), *cert. denied*, 444 U.S. 880, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979). Where necessary, fee petitioners may hire outside counsel to represent them in fee litigation. The outside counsel may also recover reasonable attorneys fees. *Jonas v. Stack*, 758 F.2d 567, 569 (11th Cir.1985); *Grendel's Den Inc. v. Larkin*, 749 F.2d 945, 958 (1st Cir.1984). Plaintiffs' counsel retained the law firm of Jenner & Block to represent them in this fee petition. Given the extensive discovery conducted by both sides on the fee petition and the vigor with which defendants have litigated this issue, I find that the retention of outside counsel was reasonably necessary. Jenner & Block is entitled to recover a reasonable attorneys' fee.

As I have with the other aspects of this fee petition, I extensively reviewed the billing records and expenses claimed by Jenner & Block. I find that their fee petition is adequately documented, based upon contemporaneous time records, and supported by affidavits from the attorneys and paralegals seeking fees.

The hours spent on the fee petition litigation were reasonable. In reviewing counsel's billing records, I noted that fee counsel spent approximately 18% of their time (primarily that of Theresa Chmara) doing legal research and reviewing the underlying litigation with plaintiffs' counsel. The majority of the briefing that occurred on this fee petition was accomplished by plaintiffs' counsel rather than by fee counsel. The plaintiffs' counsel prepared the initial and amended petition for fees, the reply brief to defendants' objections and the response to defendants' motion for summary judgment. Fee counsel prepared a relatively lengthy pre-hearing memorandum and a brief memorandum in support of their second supplemental application for fees. At first blush, it would appear that the hours spent on legal research were excessive or duplicative hours spent by the plaintiffs' counsel. On the other hand, it is obvious that fee counsel must do legal research to adequately represent their client's interests. The parties engaged in substantial discovery on the fee petition and fee counsel represented plaintiffs' counsel at the hearing on the fee petition. Legal research and an extensive review of the underlying litigation were necessary in order to appropriately conduct these activities. Not all legal research results in documents for the Court's consideration. I note further that fee counsel volunteered to submit a post-hearing brief, a request which the Court declined. I find, therefore, that the hours spent on research and review were reasonably necessary.

I find that the hours spent on other tasks, such as reviewing defendants' objections to the fee petition and engaging in discovery were reasonably spent. It was necessary for fee counsel to engage in this work primarily because defendants vigorously objected to the fee petition. Defendants' objections were lengthy and specific. Fee counsel was required to spend a great deal of time preparing their response to these objections. *City of Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed. 2d 466 (1986). I find, therefore, that the hours claimed by fee counsel are reasonable and will award fees for the hours sought.

**10.** *See* Table 2, *infra.*

The hourly rates sought by fee counsel are reasonable. Fee counsel requests fees at hourly rates ranging from $220 per hour to $55 per hour. These rates are higher than the rates sought by plaintiffs' counsel. However, Jenner & Block is a major law firm, with offices in Washington, D.C., among other cities, and the hourly rates sought are the rates charged by these lawyers for their work with other clients. *See* Declaration of Bruce J. Ennis at 4. In *Louisville Black Police Officers,* 700 F.2d at 277, the Sixth Circuit noted:

> This is not a case in which a private out-of-town practicing attorney has been called in to try a case. In such a situation, the court would be justified in looking to his or her standard rate in the community where that attorney normally practices as a reflection of that attorney's training, background, expertise and skill.

The declarations of fee counsel adequately document their unique expertise and skill, as well as the fact that the hourly rates sought are those charged to paying clients in the Washington, D.C. area. *See also* Declaration of William A. Bradford, PX 4 at 3 (indicating reasonable Washington, D.C. hourly rates). I will award fee counsel fees at the hourly rates sought.

Fee counsel have established to my satisfaction that the fees sought for paralegal and librarian assistance would normally be billed separately to paying clients, and are not included in the firm's overhead. *See* Declaration of Chandanie Botejue; PX 4 at 4 (indicating that Washington, D.C. firms bill paralegals to clients, and do not charge their time to overhead). These fees will also be allowed.

Finally, I find that the expenses sought by fee counsel are reasonable and appropriate. Fee counsel seek reimbursement for expenses such as postage, transportation, long distance telephone calls, special messenger services and photocopying. I am satisfied that these are the type of expenses which would normally be billed to paying clients and that the expenses were reasonably necessary to the litigation. I will, therefore, reimburse fee counsel for the expenses claimed.

TABLE 1

Amended Application
Attorney's Fees

| Attorney | Hours | Fee |
|---|---|---|
| Elizabeth Alexander | | |
| In court ($190/hour) | 334.60 | $ 63,574.00 |
| Out of court ($150/hour) | 2,293.35 | |
| — 10% partial success | 2,064.02 | |
| — 2% excess/duplication | 2,022.74 | 303,411.00 |
| Travel ($80/hour) | 321.25 | 25,700.00 |
| Total | | $392,685.00 |
| | | |
| Adjoa Aiyetoro | | |
| In court ($160/hour) | 218.35 | |
| — 25% partial success | 163.77 | $ 26,203.20 |
| Out of court ($125/hour) | 1,434.00 | |
| — 40% partial success | 860.40 | |
| — 2% excess/duplication | 843.20 | 105,400.00 |
| Travel ($75/hour) | 129.95 | 9,746.25 |
| Total | | $141,349.45 |
| | | |
| Patricia Streeter | | |
| All hours ($110/hour) | 896.30 | |
| — 5% partial success | 851.49 | |

| Attorney | Hours | Fee |
|---|---|---|
| **Patricia Streeter** | | |
| Total | | $ 93,663.90 |
| | | |
| **Nkechi Taifa–Caldwell** | | |
| In court ($90/hour) | 150.70 | $ 13,563.00 |
| Out of court ($75/hour) | 1,001.80 | |
| — 12% partial success | 881.59 | 66,119.25 |
| Travel ($50/hour) | 46.70 | 2,335.00 |
| Total | | $ 82,017.25 |
| | | |
| **Mary McClymont** | | |
| In court ($150/hour) | 18.00 | |
| — 50% partial success | 9.00 | $ 1,350.00 |
| Out of court ($125/hour) | 75.90 | |
| — 20% partial success | 60.72 | 7,590.00 |
| Travel ($75/hour) | 16.00 | 1,200.00 |
| Total | | $ 10,140.00 |
| | | |
| **Edward Koren** | | |
| Out of court ($150/hour) | 56.75 | |
| — 5% partial success | 53.92 | |
| Total | | $ 8,088.00 |
| | | |
| **Alexa Freeman** | | |
| Out of court ($100/hour) | 23.40 | |
| Total | | $ 2,340.00 |
| | | |
| **Urvashi Vaid** | | |
| Out of court ($90/hour) | 20.30 | |
| Total | | $ 1,827.00 |
| | | |
| **Daniel Manville** | | |
| Out of court ($65/hour) | 1,732.15 | |
| — 10% partial success | 1,558.94 | $101,331.10 |
| Travel ($30/hour) | 207.55 | 6,226.50 |
| Total | | $107,557.60 |
| | | |
| **Rhonda Lipkin** | | |
| Out of court ($50/hour) | 671.85 | |
| — 33% partial success | 450.14 | $ 22,507.00 |
| Travel ($30/hour) | 44.35 | 1,330.50 |
| Total | | $ 23,837.50 |
| | | |
| **Law Clerks** | | |
| Out of court ($50/hour) | 652.80 | |
| — 18% partial success | 535.30 | $ 26,765.00 |
| Travel ($25/hour) | 15.50 | 387.50 |
| Total | | $ 27,152.50 |
| | | |
| **Law Student Interns** | | |
| Out of court ($25/hour) | 622.20 | |
| — 30% partial success | 435.54 | |
| Total | | $ 10,888.50 |
| | | |
| **Sharon Goretsky** | | |
| Out of court ($45/hour) | 27.50 | |

| Attorney | Hours | Fee |
|---|---|---|
| Sharon Goretsky | | |
| — 30% partial success | 19.25 | |
| Total | | $ 886.25 |
| | | |
| Julia Case | | |
| Out of court ($60/hour) | 21.65 | |
| Total | | $ 1,299.00 |
| | | |
| Total Attorneys' Fees | | $903,731.95 |
| | | |
| Multiplier (1.3) | | $1,174,851.54 |

### Witness Fees

| Witness | Item | Fee |
|---|---|---|
| Christensen | | |
| Dep. 4–7–86 | Witness fee | $ 30.00 |
| Trial 6–3–86 | Witness fee | 30.00 |
| | Food | 29.00 |
| Trial 6–4–86 | Witness fee | 30.00 |
| | Food | 17.60 |
| Trial 6–5–86 | Witness fee | 30.00 |
| | Food | 3.31 |
| | Hotel | 498.76 |
| Total | | $668.67 |
| | | |
| Wilber | | |
| Trial 6–5–86 | Witness fee | $ 30.00 |
| | Food | 17.60 |
| Trial 8–4–85 | Witness fee | 30.00 |
| | Food | 5.00 |
| Trial 8–5–85 | Witness fee | 30.00 |
| | Food | 3.75 |
| Hearing 3–3–88 | Witness fee | 30.00 |
| | Food | 32.79 |
| | Food | 5.25 |
| | Food | 15.65 |
| | Hotel | 87.48 |
| Hearing 3–4–88 | Witness fee | 30.00 |
| | Food | 4.00 |
| | Mileage | 58.50 |
| Total | | $380.02 |
| | | |
| McManus | | |
| Hearing 3–3–88 | Witness fee | $ 30.00 |
| | Air fare | 398.00 |
| | Parking | 21.50 |
| | Food | 20.00 |
| | Taxi | 8.00 |
| Total | | $477.50 |
| | | |
| Duel | | |
| Dep. 4–2–86 | Witness fee | $ 30.00 |
| Trial 8–5–86 | Witness fee | 30.00 |
| Trial 8–6–86 | Witness fee | 30.00 |
| | Mileage | 95.25 |
| Total | | $185.25 |

| Witness | Item | Fee |
|---|---|---|
| Rundel | | |
| Trial 10–22–86 | Witness fee | $ 30.00 |
| | Air fare | 560.00 |
| | Food | 16.57 |
| Total | | $606.57 |
| | | |
| Chapman | | |
| Dep. 5–9–86 | Witness fee | $ 30.00 |
| | Air fare | 165.00 |
| | Food | 3.43 |
| | Ground transportation | 16.00 |
| Trial 8–6–86 | Witness fee | 30.00 |
| | Air fare | 408.00 |
| | Hotel | 102.45 |
| | Food | 14.27 |
| Dep. 11–5–85 | Witness fee | 60.00 |
| | Air fare | 150.00 |
| | Hotel | 139.34 |
| | Ground transportation | 70.00 |
| Total | | $1,188.49 |
| | | |
| Lay Witness Expenses | | |
| Trial 8–13–86 | | $ 95.97 |
| Trial 10–20–86 | | 61.10 |
| | | 28.40 |
| Total | | $ 185.47 |
| | | |
| Total Witnesses Expenses | | $3,691.97 |

### Disallowed Expenses Other Than Witness Fees & Expenses

No services recorded

| Date | Attorney | Expense |
|---|---|---|
| 9–16–85 and 9–17–85 | Manville | $ 371.73 |
| 6–05–85 and 6–06–85 | Aiyetoro | 236.15 |
| 9–12–85 | Taifa | 281.48 |
| 10–14–85 | Taifa | 928.47 |
| 10–15–85 | Taifa | 7.45 |
| 10–16–85 | Taifa | 13.00 |
| 10–21–85 | Taifa | 690.00 |
| 10–27–85 | Taifa | 841.64 |
| 10–19–85 to 11–01–85 | Taifa | 767.41 |
| 11–12–85 and 11–13–85 | Taifa | 485.39 |
| 11–14–85 to 11–17–85 | Taifa | 516.68 |
| 11–18–85 to 11–19–85 | Taifa | 145.48 |

| Date | Attorney | Expense |
|---|---|---|
| 11–20–85 to 11–23–85 | Aiyetoro (excessive, reduced by one-half) | $290.00 |
| 12–04–85 to 12–07–85 | Taifa | 595.93 |
| 12–16–85 to 12–18–85 | Taifa | 777.62 |
| Total | | $6,948.43 |

**Duplicate Billings**

| Date | Attorney | Expense |
|---|---|---|
| 10–16–85 | Alexander/Manville | $ 61.00 |
| 10–25–88 | Manville | 271.00 |
| Total | | $ 332.00 |

**Miscellaneous**

| Date | Attorney | Expense |
|---|---|---|
| 8–28–86 | Manville (medicine for prisoner) | $ 4.99 |

| | |
|---|---|
| Expenses Claimed | $285,392.66 |
| Less Disallowed Expert Expenses | 108,177.04 |
| Less Disallowed Attorney Expenses | 7,285.42 |
| | $169,930.20 |
| Witness Fees | 3,691.97 |
| Total Allowable Expenses and Costs | $173,622.17 |

## TABLE 2
### First Supplemental Application
### Attorneys' Fees—Merits

| Attorney | Hours | Fee |
|---|---|---|
| **Elizabeth Alexander** | | |
| Out of court ($150/hour) | 34.50 | $ 5,175.00 |
| **Adjoa Aiyetoro** | | |
| In court ($160/hour) | 1.50 | 240.00 |
| Out of court ($125/hour) | 51.00 | 6,375.00 |
| Travel ($75/hour) | 6.70 | 502.50 |
| Total | | $ 7,117.50 |
| **Law Student Interns** | | |
| Out of court ($25/hour) | 43.90 | $ 1,097.50 |
| Total Hours | 137.60 | $13,390.00 |
| Multiplier (1.3) | | $17,407.00 |

**Expenses**

| | |
|---|---|
| **Disallowed Expenses** | |
| Expert Fees | $ 2,109.00 |
| Aiyetoro Travel (8–19 to 8–28–88) | 1,007.37 |
| Total | $ 3,116.37 |

## Expenses

| | |
|---|---:|
| Expenses Claimed | $ 6,709.14 |
| Less Disallowed Expenses | 3,116.37 |
| Allowed Expenses | $ 3,592.77 |

### Fees–Fee Petition

| | | |
|---|---:|---:|
| Elizabeth Alexander | | |
| Out of court ($150/hour) | 12.50 | $ 1,875.00 |
| | | |
| Adjoa Aiyetoro | | |
| In court ($160/hour) | 1.00 | 160.00 |
| Out of court ($125/hour) | 22.90 | 2,862.50 |
| Travel ($75/hour) | 2.71 | 203.25 |
| Total | | $ 3,225.75 |
| | | |
| Mark Lopez | | |
| Out of court ($75/hour) | 50.20 | $ 3,765.00 |
| | | |
| Law Clerks | | |
| Out of court ($50/hour) | 16.00 | $ 800.00 |
| | | |
| Law Student Interns | | |
| Out of court ($25/hour) | 72.80 | $ 1,820.00 |
| Total | | $11,485.75 |
| | | |
| Total Attorneys' Fees | | $28,892.75 |
| Total Expenses | | 3,592.77 |
| GRAND TOTAL | | $32,485.52 |

## TABLE 3

### Second Supplemental Application
### Attorney Fees

| Attorney | Hours | Fee |
|---|---:|---:|
| Bruce J. Ennis ($220/hour) | 89.00 | $19,580.00 |
| David W. Ogden ($165/hour) | .50 | 82.50 |
| Donald B. Verrilli, Jr. ($140/hour) | 201.00 | 28,140.00 |
| Mark D. Schneider ($140/hour) | 37.50 | 5,250.00 |
| Theresa Chmara ($90/hour) | 433.75 | 39,037.50 |
| Chandanie Botejue ($70/hour) | 7.50 | 525.00 |
| Mary C. Nally ($65/hour) | 41.75 | 2,713.75 |
| Paul Cane ($65/hour) | 4.0 | 260.00 |
| Vivek Jain ($55/hour) | 1.0 | 55.00 |
| Rosalie Gerber ($70/hour) | 2.5 | 175.00 |
| Total | 818.50 | $95,818.75 |

Expenses

| | |
|---|---|
| Total Expenses | $7,228.30 |
| GRAND TOTAL | $103,047.05 |

TABLE 4

| Total Attorneys' Fees | |
|---|---|
| Amended Application | $1,174,851.54 |
| First Supplemental Application | 28,892.75 |
| Second Supplemental Application | 95,818.75 |
| Total | $1,299,563.04 |
| **Total Expenses** | |
| Amended Application | $173,622.17 |
| First Supplemental Application | 3,592.77 |
| Second Supplemental Application | 7,228.30 |
| Total | $184,443.24 |
| GRAND TOTAL | $1,484,006.28 |

---

ORDER

In accordance with the opinion entered April 5, 1989;

IT IS HEREBY ORDERED that Plaintiffs' Amended Application for Attorneys' Fees, Plaintiffs' Supplemental Application for Attorneys' Fees and Plaintiffs' Second Supplemental Application for Attorneys' Fees are GRANTED;

IT IS FURTHER ORDERED that Defendants shall pay to Plaintiffs' counsel the sum of $1,484,006.28 in attorneys' fees, expenses and costs.